**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Ronald Duane BEAULIEU,**
**Defendant–Appellant.**

**No. 88–2568.**

United States Court of Appeals,
Tenth Circuit.

April 17, 1990.

---

**1532**

Edward Y. Crandall, Midwest City, Okl., for defendant-appellant.

Robert G. McCampbell, Asst. U.S. Atty. (William S. Price, U.S. Atty., with him on the brief), Oklahoma City, Okl., for plaintiff-appellee.

Before TACHA and SETH, Circuit Judges, and BROWN, District Judge *.

SETH, Circuit Judge.

Ronald Duane Beaulieu, defendant-appellant, was convicted by a jury for conspiracy to manufacture amphetamines, 21 U.S.C. § 846, and for the unlawful possession of amphetamine oil with an intent to manufacture one (1) ounce of amphetamine in violation of 21 U.S.C. § 841(a)(1). The sentencing judge increased defendant's offense level under the United States Sentencing Commission Guidelines ("Guidelines") on the basis of a finding that defendant obstructed justice by testifying untruthfully. On appeal, defendant challenges both the sufficiency of evidence to support his conviction and the trial court's upward adjustment under § 3C1.1 of the Guidelines.

Defendant's indictment stems from a Drug Enforcement Administration ("DEA") investigation which began after several individuals purchased chemicals used to process amphetamines from Mid-America Chemical Company in Oklahoma City, Oklahoma. As a result of this investigation, police officers executed a search warrant of defendant's residence. In the defendant's presence, officers searched his bedroom and found a single burner heating device, two bottles of brown liquid and

---

* Honorable Wesley E. Brown, United States District Judge for the District of Kansas, sitting by designation.

glassware. Furthermore, the record reveals that the search produced defendant's telephone bill indicating two long distance calls made to Mid–America Chemical Company (Exhibit 115) and an empty Mid–America Chemical box (Exhibit 116). Record, Vol. 3, at 246–48. Subsequently, a superseding indictment was returned against defendant charging him in Counts I and IV with violating 21 U.S.C. § 846 and 21 U.S.C. § 841(a)(1), respectively. The indictment also charged defendant's brothers John and Darrell, and five others with conspiracy to manufacture amphetamine and other drug related crimes.

Defendant was tried jointly with his brother John Beaulieu. *See United States v. John Beaulieu*, 900 F.2d 1537, (10th Cir.); *United States v. Darrell Beaulieu*, 893 F.2d 1177 (10th Cir.). At trial, a chemist testified that one bottle seized from defendant's bedroom contained a solution of amphetamine dissolved in ether and that sufficient amphetamine existed to extract it from the ether. Record, Vol. 3, at 232–34. There was also testimony from several government witnesses which conflicted as to whether the defendant purchased chemicals or participated in the "cooks."

Mr. Schickedanz, a DEA special agent, provided the most damaging testimony to defendant. In his opinion, the physical evidence seized from defendant's bedroom was all that was necessary to manufacture amphetamine by the "powdering out" process. Record, Vol. 3, at 244–45. To "powder out" amphetamine, defendant could place a clear dish on the heating device along with a small amount of the amphetamine-ether solution. After the heating device evaporated the ether, the resulting white powdery substance would be unlawful amphetamine sulfate. *Id.* at 245. Moreover, manufacturers of amphetamines save only small amounts of amphetamine in order to extract as much amphetamine from the liquid as possible. *Id.* at 244. Finally, the record shows that Mr. Schickedanz identified Exhibit 50 as a receipt from Mid–America Chemical Company attributable to defendant for the purchase of known

precursor chemicals to manufacture amphetamine. *Id.* at 241–43.

The defendant denied all involvement in the production of amphetamine. He testified that the heating device was in his room to heat coffee or hot chocolate and that the brown liquid was starter fluid. Record, Vol. 3, at 308–311. Defendant testified that the ether was used to work on his carburetors and he was unaware that it was contaminated. *Id.* at 316. Further, he explained that the woman he bought the precursor chemicals from at Mid–America "misled" him about the type of chemicals he bought because he thought he was buying chemicals for his gold and silver business. *Id.* at 312–313.

Defendant admits the evidence shows he possessed amphetamine, but argues the evidence is insufficient to sustain his conviction for intent to manufacture amphetamine under 21 U.S.C. § 841(a)(1). In evaluating the defendant's sufficiency of evidence challenge, we note that he bears a heavy burden. We must review whether "[t]he evidence—both direct and circumstantial, together with the reasonable inferences to be drawn therefrom—is sufficient if, when taken in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." *United States v. McKinnell*, 888 F.2d 669, 673 (10th Cir.) (citing *United States v. Brandon*, 847 F.2d 625, 630 (10th Cir.)). The evidence supporting a conviction must be substantial, raising more than a mere suspicion of guilt. *Id.* (citing *United States v. Troutman*, 814 F.2d 1428, 1455 (10th Cir.)). After viewing the evidence in this light, we find ample evidence to support the jury's conviction.

21 U.S.C. § 841(a)(1) makes it a crime to knowingly or intentionally possess a controlled substance with the intent to manufacture. Amphetamine in liquid and powder form is a Schedule II controlled substance. *See* 21 C.F.R. § 1301.02(b)(7) (1988). Defendant urges that "[c]ommon sense dictates that larger quantities of amphetamine would be necessary to evince an intention to manufacture." Defendant–Appellant's Brief at 14. Defendant argues

that the small amount of physical evidence seized combined with the absence of other physical evidence (precursor chemicals, chemical apparatus, drug paraphernalia and any natural chemical by-products) weighs in favor of mere personal possession.

 Defendant's contention that larger quantities of amphetamine are "necessary to evince an intention to manufacture" is without merit. As support, defendant urges us to consider case law concerning possession with intent to distribute. It is well settled, however, that possession with intent to distribute and manufacture are distinct charges that require proof of different elements. *See United States v. Zamora*, 784 F.2d 1025, 1029 (10th Cir.). Although quantity is an important factor with respect to the charge of possession with intent to distribute, it simply is not essential to prove intent to manufacture. *See United States v. Washington*, 858 F.2d 590, 594 (10th Cir.) (defendant's possession of one pint of piperdine was a sufficient amount to support the charge of intent to manufacture PCP); *United States v. Young*, 862 F.2d 815, 818 (10th Cir.) (trace amounts of liquid methamphetamine was a sufficient amount, along with other evidence, to support the inference that the defendant intended to convert it to powder methamphetamine).

 Moreover, the government is not required to prove the existence of all the physical evidence associated with the production process to sustain a conviction for intent to manufacture under 21 U.S.C. § 841(a)(1). In *Young* this court found that evidence showing defendant's possession of liquid methamphetamine with the intent to convert it to finished powder methamphetamine was sufficient to support an intent to manufacture conviction under 21 U.S.C. § 841(c)(1). In rejecting the argument that to sustain an intent to manufacture conviction the government must present physical evidence showing the capability of further manufacture and evidence of a precursor element we stated:

"The government is not required to present evidence from a currently operat-

ing laboratory in order to sustain a possession with intent to manufacture charge. Under these circumstances, the evidence of the residue and the byproducts of the manufacturing process was sufficient to prove the charge in the indictment."

*Young*, 862 F.2d at 819.

 Similarly, in this case a reasonable jury could infer that the defendant manufactured amphetamine by using the "powdering out" process to extract amphetamine from ether to produce unlawful white powder amphetamine. Defendant's possession of the amphetamine-ether solution and heating device supports the inference that he intended to use the heating device to convert the solution to powder amphetamine. This is a reasonable inference given the testimony of Mr. Schickedanz that the defendant had all the necessary equipment to manufacture amphetamine, by converting the solution through the powdering out process to unlawful powder amphetamine. The jury considered evidence that if the defendant heated the solution, the ether would evaporate and the remaining substance would be powder amphetamine. The jury was free to reject defendant's hypothesis that the heating device was used to heat hot chocolate or coffee.

Furthermore, as in *Young*, the process of converting liquid amphetamine into a finished powder form is consistent with the term "manufacture" which is defined in 21 U.S.C. § 802(15) as:

"the production, preparation, propagation, compounding, or processing of a drug or other substance, either directly or indirectly or by extraction from substances of natural origin, or independently by means of chemical synthesis or by a combination of extraction and chemical synthesis, and includes any packaging or repackaging of such substance or labeling or relabeling of its container...."

In addition, the jury considered other evidence (the chemical box, the phone bill and receipt for the purchase of precursor chemicals) from which it could reasonably infer that defendant intended to manufacture

amphetamine. Of further importance is the eyewitness testimony of Regina Chester who observed defendant carry some amphetamines from a place of processing and recalled him talking about purchasing chemicals. Record, Vol. 3, at 122, 130–31. Clint Brown testified that he believed defendant took an active role in manufacturing amphetamine, purchased chemicals and was present during four to six cooks. *Id.* at 144–45. Although other co-defendants presented conflicting testimony, it is within the exclusive province of the jury to determine the credibility of witnesses at trial. *See United States v. Gillock*, 886 F.2d 220, 222 (9th Cir.). Viewed in a light most favorable to the government, we are satisfied that a rational trier of fact could conclude beyond a reasonable doubt that defendant possessed amphetamine oil with the intent to convert it to powder amphetamine, in violation of 21 U.S.C. § 841(a)(1).

At the sentencing hearing the trial judge found that the defendant obstructed justice by testifying untruthfully at his trial. Based on this finding, the court enhanced defendant's sentence by increasing his base offense level by two pursuant to Section 3C1.1 of the Guidelines. The sentences as imposed are within the Guidelines. Defendant appeals contending, among other things, that the trial judge's upward *adjustment* was an abuse of discretion because it was based on insufficient finding of facts.

At sentencing the trial court stated as to the adjustment:

"The evidence at trial concerning [defendant], was overwhelming in the Court's view. And the jury flatly rejected the testimony that he provided.

"The Court does not criticize defense counsel for putting [defendant] on the stand....

But the [defendant's] testimony was flatly contradicted by the other evidence at trial.

"And the Court believes that a defendant who testifies falsely at trial should be subject to an increased offense level. And I am more than adequately per-

suaded that the defendant perjured himself during his testimony at trial."
Record, Vol. 5, at 72.

In our review of the trial court's decision to adjust, within the Guidelines, defendant's base offense level under Section 3C1.1 of the Guidelines we must "give due regard to the opportunity of the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous and shall give due deference to the district court's application of the guidelines to the facts." 18 U.S.C. § 3742(e).

■ We have held, in cases of departures, that the trial court must specify its reasons for *departure* from the Guidelines and we must vacate the sentence if the trial court fails to do so. *See* 18 U.S.C. § 3553(b) and (c)(2). This was clearly described in *United States v. Smith*, 888 F.2d 720 (10th Cir.), and followed in *United States v. Emrick*, 895 F.2d 1297 (10th Cir.), and *United States v. White*, 893 F.2d 276, 278 (10th Cir.). If the trial court does not explicitly set forth the considerations that motivate its decision to *depart* from the Guidelines, we will not speculate as to what those considerations may have been.

■ In the case before us, however, we do not have a *departure* from the Guidelines, but instead an upward *adjustment* to a point still within the Guidelines. The strict and added requirements for departures do not apply. False testimony may arguably have some elements to place it in a separate category, but this is not enough and the consequences of its application are no more severe than several other factors not considered as crimes. It is the *departure* from the Guidelines which is the significant factor under the statute and in the Tenth Circuit cases cited above and calls for the specific explanation by the trial judge. The Guidelines do not require "findings" for *adjustments* more specific than were the reasons here expressed by the trial judge at sentencing.

The Fifth Circuit in *United States v. Mejia–Orosco*, 867 F.2d 216, *reh'g denied*, 868 F.2d 807, recently described the difference between the standard of review appli-

cable to "adjustments" and to "departures" under the Guidelines:

"We will affirm sentences imposed by district judges who make factual findings that are not clearly erroneous, and who apply the guidelines to those findings. In such cases, the sentencing judge need not offer further reasons justifying the sentence. When, however, the judge departs from the guideline range, an additional reasonableness requirement applies: the judge must offer reasons explaining why the departure is justified in terms of the policies underlying the sentencing guidelines."

867 F.2d at 221. Based on this distinction, the Fifth Circuit held that the sentencing judge's simple statement that defendant was a "manager" or "leader" was a finding of fact which was sufficient to justify an *upward adjustment* under Section 3B1.1 of the Guidelines. The court further stated that "we 'decline to require the judge to write out' more specific findings about the defendant.... [S]o formal a requirement would interfere with the smooth operation of the sentencing hearing." *Id.* (citing *Wainwright v. Witt*, 469 U.S. 412, 430, 105 S.Ct. 844, 855, 83 L.Ed.2d 841); *see also, United States v. Duque*, 883 F.2d 43 (6th Cir.) (the sentencing judge is not required to state with particularity the reasons for setting a sentence which falls within the Guidelines); *United States v. Reed*, 882 F.2d 147 (5th Cir.).

The statute, 18 U.S.C. § 3553(c), as amended, captioned "Statement of reasons for imposing a sentence," as here applicable, directs that the court at sentencing "shall state in open court the reasons for its imposition of the particular sentence." The statute in subsection (c)(2) provides for a more specific statement under other circumstances not here applicable. This general requirement as to "reasons", in our view, was satisfied by the trial court in the case before us. No "finding" of facts is required in these circumstances. *See United States v. Duque*, 883 F.2d 43 (6th Cir.).

The general jury verdict against the defendant who here testified would not have been alone enough to demonstrate false testimony. The trial judge here mentioned it as a factor in saying that the jury "flatly rejected the testimony that he [the defendant] provided," but, in our view, this would not have been enough alone, and really was a factor without any significance. The judge's finding as to the "contradiction" of defendant's testimony by "other evidence at trial" was enough on this record.

We have considered the fact that much of the testimony in issue on this point went to the extent the defendant participated in the enterprise. We have described above some of this testimony. It was not bare opinion nor an expression of subjective views, but went to specific acts. There was some conflicting testimony, and many if not all of the witnesses were co-conspirators. The presence of these factors, in our view, does not lead to a different conclusion than here reached.

The false testimony determination should here be treated the same way as would have been one as to whether a defendant was a "manager" or "leader" in another adjustment case. This result has an obvious impact on a defendant's decision whether or not to testify. However, this consequence and the imposition of penalties for false testimony has been considered by the Supreme Court in *United States v. Grayson*, 438 U.S. 41, 98 S.Ct. 2610, 57 L.Ed.2d 582. *Grayson*, of course, was not a Guidelines case, but involved the same considerations as are here. The Supreme Court in *Grayson* stated:

"Soon after *Williams [v. New York*, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949),] was decided, the Tenth Circuit concluded that 'the attitude of a convicted defendant with respect to his willingness to commit a serious crime [perjury] ... is a proper matter to consider in determining what sentence shall be imposed within the limitations fixed by statute.' *Humes v. United States*, 186 F.2d 875, 878 (1951). The Second, Fourth, Fifth, Sixth, Seventh, Eighth, and Ninth Circuits have since agreed."

438 U.S. at 50–51, 98 S.Ct. at 2615–16. Further, the Court in *Grayson* referred to

the defendant's argument as to the impact of these holdings on defendant's right to testify. The Court there said:

"Grayson's argument that judicial consideration of his conduct at trial impermissibly 'chills' a defendant's statutory right, 18 U.S.C. § 3481 (1976 ed.), and perhaps a constitutional right to testify on his own behalf is without basis. The right guaranteed by law to a defendant is narrowly the right to testify truthfully in accordance with the oath—unless we are to say that the oath is mere ritual without meaning. This view of the right involved is confirmed by the unquestioned constitutionality of perjury statutes, which punish those who willfully give false testimony.... Further support for this is found in an important limitation on a defendant's right to the assistance of counsel: Counsel ethically cannot assist his client in presenting what the attorney has reason to believe is false testimony.... Assuming, *arguendo*, that the sentencing judge's consideration of defendants' untruthfulness in testifying has any chilling effect on a defendant's decision to testify falsely, that effect is entirely permissible. There is no protected right to commit perjury."

438 U.S. at 54, 98 S.Ct. at 2617–18. The Guidelines' comment on the increase of offense levels for obstruction by false statements (and other ways) is at § 3C1.1, n. 3, and includes the following statement:

"This provision is not intended to punish a defendant for the exercise of a constitutional right. A defendant's denial of guilt is not a basis for application of this provision."

AFFIRMED.